## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | |
|---|---|
| SENECA COMPANIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>D&H UNITED FUELING SOLUTIONS,<br>INC. and JF ACQUISITION, LLC,<br><br>Defendants. | Civil Action No. 4:24-cv-00023-RGE-WPK<br><br>**FIRST AMENDED COMPLAINT**<br>**JURY DEMANDED** |

Plaintiff Seneca Companies, Inc. ("Seneca"), by its undersigned counsel, alleges against Defendants D&H United Fueling Solutions ("D&H") and JF Acquisition, LLC ("JF") as follows:

## NATURE OF THE CASE

1.     This is an action for breach of Defendants' contracts with Seneca and tortious interference with Seneca's existing and prospective agreements with customers and employees.

2.     Seneca is the leading provider of fueling equipment and support services in the Central United States, working with the region's largest retail fueling chains to help build, maintain, and upgrade their fueling infrastructure. Seneca's position in the industry has been anchored by its longstanding relationship with Gilbarco Veeder-Root ("Gilbarco"), the market-share leading manufacturer of fuel dispensers and related systems, and one of only two North American producers of fuel dispensers. Purchases from Gilbarco comprised nearly 60% of Seneca's total supply expenditures in 2022.

3.     Defendants also distribute Gilbarco equipment, and they compete with Seneca in the market of supplying and servicing fuel dispensers for retail fueling chains.

4.      In 2023, Defendants each signed a Confidentiality Agreement with Seneca related to a possible business transaction involving a sale of a majority ownership stake in Seneca. These Confidentiality Agreements restrict Defendants' use of sensitive non-public information they received about Seneca and prohibit Defendants from, among other things, soliciting Seneca's customers and employees or inducing any supplier to terminate or reduce its relationship with Seneca. JF also agreed in a separate Service Subcontractor Agreement with Seneca that JF would not directly or indirectly recruit any Seneca employee without Seneca's prior written consent.

5.      A transaction between Seneca and Defendants never came to fruition. Instead, Seneca chose to form a business relationship with a different entity. Faced with the prospect of heightened competition in the market due to Seneca's acquisition by someone else, Defendants hatched a scheme to attack Seneca's business.

6.      Defendants first breached their Confidentiality Agreements by inducing Gilbarco to terminate its agreements with Seneca based, in whole or in part, on Defendants' commitment to move into and begin servicing customers in Seneca's current territories. Defendants also breached their Confidentiality Agreements by soliciting Seneca customers, informing them that Seneca would no longer be able to supply fueling infrastructure and services due to Gilbarco's action, and D&H further breached by soliciting Seneca employees. Defendants then proceeded to tortiously interfere with Seneca's existing and prospective contracts and business relations with retail fueling customers.

7.      In addition, Seneca has Non-Compete Agreements in place for numerous employees, and by soliciting Seneca employees after being informed of those agreements, at least D&H has tortiously interfered with Seneca's existing contracts with its employees.

8.      Seneca thus has no choice but to bring this action. Seneca has suffered—and if Defendants are not enjoined from continuing the unlawful onslaught on Seneca's business, will continue to suffer—irreparable harm. Seneca also brings this action to recover for the damages that it has sustained as a result of Defendants' breaches and tortious interference.

## PARTIES, JURISDICTION, AND VENUE

9.      Plaintiff Seneca is an Iowa corporation with its principal place of business at 4140 East 14th Street, Des Moines, Iowa 50313.

10.      Upon information and belief, defendant D&H is a Delaware corporation with its principal place of business at 8559 E North Belt, Humble, Texas 77396.

11.      Upon information and belief, defendant JF is a North Carolina limited liability company with its principal place of business at 100 Perimeter Park Drive, Suite H, Morrisville, North Carolina 27560, and no member of JF is a citizen of Iowa.

12.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Seneca and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13.      The Court has personal jurisdiction over Defendants because they have attempted to solicit Seneca's employees and customers located in Iowa and thus have sufficient minimum contacts with Iowa. In addition, each of the Confidentiality Agreements provide: "Any legal suit, action or proceeding relating to this Agreement must be instituted in the federal or state courts located in Des Moines, Polk County, Iowa. Each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding."

14.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Seneca's claims occurred in this District.

# BACKGROUND

### A. Seneca's Business.

15.     Seneca was founded in 1972 with the goal of supplying quality equipment and innovative service to customers in the petroleum industry throughout the Midwest. Almost five decades later, Seneca has expanded its capabilities and geographic reach and has evolved into a multifaceted service provider that offers customers "The Complete Solution" for their construction, operation, and maintenance needs. Seneca's services span retail fueling chains in twenty-three states, and Seneca leads the market in seven of them.

16.     Seneca's comprehensive offerings of products and services—*e.g.*, installation, maintenance, repair, and environmental—provides simplicity and convenience for its customers and generates opportunities for increased market coverage.

17.     Seneca maintains the confidentiality of information concerning its premier customer base, industry leading processes and systems, and employees because this data provides a distinct advantage over competitors and is critical to the success of Seneca's business. Seneca has invested substantial time, money, and effort to develop this confidential and proprietary information, and it has taken significant efforts to guard secrecy of the same. Seneca ensures that its agreements, like the Confidentiality Agreements and Non-Compete Agreements at issue here, include terms to rigorously protect the confidentiality of its proprietary information.

### B. Seneca's Relationship with Gilbarco and Customers.

18.     Seneca's business relationship with Gilbarco spans more than 40 years and multiple contracts, including distributor agreements executed in 2012 and 2019 and numerous service agreements (collectively, the "Gilbarco Agreements"). Under these contracts, Seneca agreed to distribute and service Gilbarco's retail fuel pumps and related equipment. The parties enjoyed a

mutually beneficial relationship on these terms, with Seneca making substantial investments to develop customer relationships in furtherance of its Gilbarco distributorship. Indeed, over the course of decades, Seneca has developed deep relationships with numerous customers to meet their needs for the supply and service of Gilbarco fuel pumps and other related equipment pursuant to written agreements and other business arrangements. As a testament to Seneca's success serving its customers, Gilbarco recognized Seneca with its 2021 Distributor of the Year award.

19.     Looking to the future, Seneca concluded that institutional backing—with the additional resources that could provide—was key for the continued development of its business. Therefore, Seneca sought out a partner or buyer with the resources and commitment to support Seneca's plans for growth and advancement.

### C. The Confidentiality Agreements.

20.     Defendants are fuel pump installers and servicers that compete with Seneca, and both were interested in a potential transaction to combine with Seneca. Before sharing any confidential information with Defendants, and as a prerequisite for doing so, Seneca required Defendants to sign the Confidentiality Agreements.

21.     The Confidentiality Agreement between Seneca and D&H was effective as of April 4, 2023. The Confidentiality Agreement between Seneca and JF was effective as of August 9, 2023. Among other things, the Confidentiality Agreements require D&H and JF to preserve the confidentiality of Seneca's information and—for a period of two years after the effective dates—generally prohibit them from (a) soliciting Seneca's employees, (b) soliciting current or potential Seneca customers, and (c) inducing vendors or suppliers to terminate or reduce their relationships with Seneca.

22.    In signing the Confidentiality Agreements, Defendants expressly acknowledged that Seneca could suffer irreparable harm if Defendants breached their obligations and, in turn, Seneca would be "entitled to" injunctive relief to remedy and prevent such harm.

23.    Under the Confidentiality Agreements, Seneca disclosed certain confidential information to Defendants as they evaluated a potential purchase of Seneca, before Seneca ultimately sold to a different, unrelated private equity firm based in Dallas, Texas. As potential buyers, both Defendants received the Confidential Information Memorandum, dated June 2023, which contained detailed information about Seneca's business and product offerings, market share, and customers.

24.    In addition, JF received detailed confidential information relating to: (a) the job titles, hire dates, locations, and salaries of Seneca employees; (b) Seneca's licenses; (c) Seneca's relationship with Gilbarco, including rebates from Gilbarco; and (d) Seneca's internal financials.

25.    On or about August 9, 2023, the Chairman of the Board of JF, Barrett Gilmer, sent Seneca's CEO, JC Risewick, an email in connection with JF's evaluation of potentially purchasing Seneca. Mr. Risewick passed this email on to the broker representing Seneca in the sale process, D.A. Davidson, which then followed up with Mr. Gilmer on his behalf. Notably, JF had been invited to participate in the sale process months earlier, but JF waited until the process was well underway to reach out. Further, Mr. Gilmer expressed in sum or substance to D.A. Davidson that Seneca would have no choice but to sell to JF because JF was the only potential purchaser with both sufficient resources to buy Seneca and a clear path to obtaining Gilbarco's approval for the transaction.

26.     D&H also received extensive confidential information under the Confidentiality Agreement relating to: (a) the profit generated by Seneca's largest customers and the tenure of all of Seneca's customers; (b) Seneca's internal financials; (c) Seneca's sales data, service rates, and employee/region performance metrics; (d) certain customer contracts and scorecards; (e) Seneca's service contractor agreement with Gilbarco; (f) the number of Seneca technicians by region; and (g) salary and compensation data for Seneca employees and management, including employee names.

27.     The sensitive and competitively valuable information made available to both JF and D&H under the Confidentiality Agreements included, among other things: an in-depth look at Seneca's operations and financials; employee wages; copies of Seneca's marketing materials highlighting its capabilities and the various services that it offers to customers, Seneca's business terms with significant customers and with Gilbarco; and, with respect to D&H, "scorecards" showing key performance indicators related to maintenance and repair visits and invoicing on a customer-by-customer basis.

**D.  The Service Subcontractor Agreement.**

28.     Later in 2023, after Seneca made information available to JF under the Confidentiality Agreement, JF engaged Seneca as a subcontractor to assist with servicing certain retail fueling locations pursuant to a JF Petroleum Group Service Subcontractor Agreement, which is effective as of October 12, 2023, and has a two-year term.

29.     The Service Subcontractor Agreement between JF and Seneca includes, among other things, a mutual employee non-solicitation provision. During the two-year term of this contract and for one year following a termination of employment, JF agreed "not to directly or

indirectly: solicit, recruit, or induce any employee of [Seneca] to terminate their employment relationship with [Seneca] or any of [Seneca's] Subsidiaries or to work for any other person or entity engaged in the Business, without prior written mutual consent and agreement between JF Petro and [Seneca]." The only carve-out from this limitation is an agreement that JF may hire an employee of Seneca "who responds to and applies for a general job opening posted by [JF]."

**E. The Non-Compete Agreements.**

30.     The vast majority of Seneca employees have signed Seneca's standard Non-Compete Agreement. Under these agreements, employees promise that for a period of two years after their employment with Seneca ends—whether the employment is terminated by Seneca, by the employee, or by mutual consent—the employee "shall not, directly or indirectly, individually or as a partner, shareholder, principal, employee, agent, officer, director, investor, manager, trustee, solicitor, representative, independent contractor, counsel, or in any other capacity participate or engage in any business competing with the business of [Seneca] within the Restricted Area." The "Restricted Area" under the Non-Compete Agreements "means an area within a radius of two hundred (200) miles" from the employee's place of employment with Seneca.

31.     Employees expressly acknowledge, agree, and warrant in the Non-Compete Agreements that the terms therein "are reasonable and consistent with the right of [Seneca] to protect its business, and are not to be held invalid or unenforceable because of the scope of the area, actions subject [t]hereto or restricted [t]hereby, or the period of time within which such restrictions are operative." The Non-Compete Agreements also prohibit employees from retaining or using Seneca's confidential information after their employment with Seneca ends, including,

but not limited to, customer lists, phone lists, and the techniques, methods, or procedures used for the operation of Seneca's business.

32.     On February 7, 2024, Seneca informed D&H and JF that most of Seneca's employees are subject to the Non-Compete Agreements, including the terms described above.

**F. Defendants' Breaches of Contract and Tortious Interference.**

33.     In or around the first week of October 2023, before the sale of Seneca, Bryan Crossan, a Vice President at Gilbarco, suggested to Mr. Risewick in a telephone conversation that Gilbarco was working with others—who were not identified—to prepare a "contingency plan" if Seneca sold to a buyer that Gilbarco disapproved of. Mr. Crossan told Mr. Risewick that Seneca "would not like" the contingency plan. On or about October 27, however, Mr. Crossan and Dave Coombe, a Gilbarco President, met with Mr. Risewick and representatives of the Dallas-based private equity firm—which was the leading contender to purchase Seneca—and when asked if Gilbarco would support Seneca's sale to this potential buyer, Mr. Coombe responded that there was "a possible path forward." The discussion during this meeting centered around Seneca's willingness to take any number of steps to address and alleviate any concerns Gilbarco may have about the proposed sale. Mr. Coombe and Mr. Crossan indicated they wanted more time to consider Gilbarco's final position on a sale of Seneca to this potential buyer.

34.     In November 2023, Mr. Crossan and Mark Williams, another Gilbarco President, informed Mr. Risewick during an in-person meeting in Des Moines that Gilbarco did not approve of Seneca selling to the Dallas-based private equity firm. Mr. Williams offered to connect Seneca with JF and D&H if Seneca was still interested in a potential sale transaction, indicating those competitors of Seneca would be acceptable purchasers. Seneca declined this offer.

35.    At the beginning of 2024, Seneca closed its sale to the Dallas-based private equity firm. It appears that a few days later, on or about January 5, 2024, JF posted via the networking site LinkedIn.com that it was "growing in Des Moines, Iowa," and seeking to fill positions for Regional Service Director, Service Technician, and Service Manager. JF's website also shows that it posted a job opening on January 7, 2024, for a Service Administrator position in Des Moines—a territory in which JF had no prior presence. The following Tuesday, January 9, 2024, Gilbarco sent a letter to Seneca providing notice of its intent to terminate the Gilbarco Agreements (the "Termination Notice").

36.    The Termination Notice was sent to Mr. Risewick by email from Mark Williams at 9:53 a.m. Central Time on January 9. Just minutes later, at approximately 10:00 a.m. Central Time, representatives from Gilbarco met with representatives of one of Seneca's biggest customers, Casey's. This meeting had been scheduled the week before by Gilbarco. During this meeting, Gilbarco informed Casey's about the Termination Notice and laid out a detailed proposal for different contractors to begin taking over Seneca's role in selling and servicing Gilbarco products for Casey's business. The two primary contractors that Gilbarco proposed as replacements for Seneca were JF and D&H. The next day, January 10, Gilbarco followed up with a written version of this proposed "Transition Plan."

37.    Shortly after Gilbarco sent the Termination Notice, the CEO of JF, Keith Shadrick, contacted Casey's to convey that by January 15—less than a week after the Termination Notice— JF would have six technicians available to service Casey's locations in Des Moines, which is the center of Seneca's territory.

38.     Gilbarco posted via the networking site LinkedIn.com on or about January 22, 2024, that it was "pleased to announce JF Petroleum Group as newly added full-service providers in the state of Iowa" and that JF has "resources on the ground already for both service and sales and can meet customer needs immediately." JF then posted on LinkedIn.com that it was "well-equipped and ready to offer immediate service and sales support" across the entire state of Iowa—a state in which JF had virtually no presence before 2024.

39.     On or about January 25, 2024, Gilbarco also posted via LinkedIn.com that it was "pleased to announce D&H United Fueling Solutions as a newly added full-service provider in the state of Nebraska," a Seneca territory. D&H then issued a press release on or about January 29, 2024, announcing that it was "securing a new office" in Nebraska "on the heels of the recent announcement that Gilbarco Veeder-Root has awarded D&H United the rights to distribute and service Gilbarco Veeder-Root petroleum equipment throughout the state."

40.     Taken together, it is reasonable for Seneca to believe that the events and actions described above demonstrate that Defendants and Gilbarco must have been discussing and planning for Defendants to take over Seneca's customers well before Gilbarco terminated its relationship with Seneca. On information and belief, JF and D&H communicated with Gilbarco and those communications induced Gilbarco to end its long-standing relationship with Seneca.

41.     Defendants have thus breached, and are continuing to breach, their promise under the Confidentiality Agreements not to induce Seneca's vendors or suppliers to terminate or reduce their relationship with Seneca.

42.     D&H also breached other obligations under the Confidentiality Agreement. Seneca is aware, for instance, that D&H has taken various steps to solicit Seneca employees. For example,

on or about January 12, 2024, a representative of D&H contacted a Seneca service technician based in Nebraska and recruited him to join D&H, emphasizing as part of the solicitation that Seneca's agreements with Gilbarco would soon be ending. Similarly, on or about January 19, 2024, a Director of Training at D&H directly solicited a Gilbarco-certified trainer at Seneca, suggesting that "with all the upcoming changes at Seneca," D&H would be interested in having a "conversation" with him about potential employment opportunities.

43.    Seneca has also become aware that (i) certain of its technicians based in Missouri have resigned and joined D&H after D&H made them offers of employment; (ii) a D&H subsidiary, Kubat Equipment and Service Company, has been making employment offers to Denver-based Seneca technicians; (iii) the chairman of D&H contacted a Vice President of Service at Seneca in January 2024 to inquire about his interest in other employment following Gilbarco's termination of the Gilbarco Agreements; and (iv) on or about February 6, 2024, D&H's chairman then extended a formal offer to the Vice President of Service. Notably, the Seneca employees that have been solicited by D&H and its subsidiary are all subject to Non-Compete Agreements.

44.    On information and belief, D&H has leveraged Seneca's confidential employee information, including employee names and compensation, to identify, target, and solicit Seneca employees. Based on the compensation data gleaned from Seneca's confidential information shared under the Confidentiality Agreement, D&H was in a position to make offers that it likely knew would be attractive to Seneca's employees.

45.    In addition, on or about February 8, 2024—*after* Seneca formally notified D&H about the Non-Compete Agreements—a recruiter working on behalf of D&H solicited at least half a dozen Seneca technicians, all of whom are subject to Non-Compete Agreements.

46.    D&H has also solicited Seneca customers by using Seneca's confidential information, including the profits that Seneca's largest customers generate for Seneca, to position D&H as an attractive alternative given Seneca's loss of its Gilbarco distributorship.

47.    JF has similarly breached its obligations to Seneca under the Confidentiality Agreement. On or about December 19, 2023, a Director of Service Operations for Casey's reported that JF was soliciting Casey's business. This occurred at a lunch, during which the JF representative conveyed that Gilbarco was against Seneca's potential sale to the Dallas-based private equity firm and that JF was looking to come into the Iowa territory—an area in which JF had little, if any, presence at the time.

48.    It is well known in the industry that contractors such as Seneca and JF would not tell a customer they are coming into a territory without first having raised the issue with Gilbarco and obtaining Gilbarco's approval, as distributorships are generally granted for a "primary marketing area" or PMA, in which a distributor generally has little or no competition (at least for sales of new products) from other distributors. Therefore, on information and belief, and based on industry custom and practice, it is highly likely that before the JF representative made the comments at this lunch on December 19, JF had discussions with Gilbarco about expanding into Seneca's territory in Iowa.

49.    On information and belief, JF has also violated the Confidentiality Agreement by soliciting other Seneca customers using Seneca's confidential customer information.

50.    Further, based on conversations with Seneca customers, Gilbarco representatives have recently proposed a go-forward arrangement for these customers in which JF and/or D&H would take over Seneca's role as the customers' distributor and primary service contractor for

Gilbarco-related work, with a right of first refusal to provide Gilbarco products and services. Under this proposed arrangement, Seneca would be a sub-contractor under JF and/or D&H, and Seneca could provide service on Gilbarco products only if JF and/or D&H first pass on the opportunity—even if customers would prefer Seneca instead of JF and/or D&H. This proposed arrangement would allow Seneca to provide service (and replacement parts) to its current customers only on their already purchased Gilbarco equipment, and it would not permit Seneca to sell new equipment. This proposed arrangement indicates that JF and D&H are continuing to take actions to undermine Seneca's relationship with Gilbarco.

## CLAIMS

### COUNT I:  BREACH OF CONTRACT AGAINST D&H

51.     Seneca realleges and incorporates all prior paragraphs by reference.

52.     The Confidentiality Agreement between Seneca and D&H is a valid and enforceable contract.

53.     The Confidentiality Agreement requires D&H to preserve the confidentiality of Seneca's information and generally prohibits D&H from (a) soliciting Seneca's employees, (b) soliciting any current or potential Seneca customers, and (c) attempting to induce any Seneca vender or supplier, such as Gilbarco, to terminate or reduce its relationship with Seneca.

54.     D&H breached the Confidentiality Agreement, including by inducing Gilbarco to terminate its relationship with Seneca and using Seneca's confidential information to solicit Seneca's employees and customers.

55.     As a direct and proximate result of D&H's breaches of the Confidentiality Agreement, Seneca has incurred and will continue to incur monetary damages in an amount to be determined at trial.

56.     D&H's breaches are also causing intangible harms to Seneca, including the loss of goodwill and business relationships with customers, which is a recognized form of irreparable injury. This injury will continue and exacerbate if D&H is not enjoined from continuing its improper solicitations of Seneca's customers and employees.

## COUNT II:  BREACH OF CONTRACT AGAINST JF

57.     Seneca realleges and incorporates all prior paragraphs by reference.

58.     The Confidentiality Agreement between Seneca and JF is a valid and enforceable contract.

59.     The Confidentiality Agreement requires JF to preserve the confidentiality of Seneca's information and generally prohibits JF from (a) soliciting Seneca's employees, (b) soliciting any current or potential Seneca customers, and (c) attempting to induce any Seneca vender or supplier, such as Gilbarco, to terminate or reduce its relationship with Seneca.

60.     JF breached the Confidentiality Agreement, including by inducing Gilbarco to terminate its relationship with Seneca and using Seneca's confidential information to solicit Seneca's customers.

61.     As a direct and proximate result of JF's breaches of the Confidentiality Agreement, Seneca has incurred and will continue to incur monetary damages in an amount to be determined at trial.

62.     JF's breaches are also causing intangible harms to Seneca, including the loss of goodwill and business relationships with customers, which is a recognized form of irreparable injury. This injury will continue and exacerbate if JF is not enjoined from continuing its improper solicitations of Seneca's customers.

## COUNT III:  BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST ALL DEFENDANTS

63.     Seneca realleges and incorporates all prior paragraphs by reference.

64.     Defendants had a duty to refrain from arbitrary or unreasonable conduct that has the effect of destroying or injuring Seneca's right to receive the fruits of its bargain under the Confidentiality Agreements.

65.     Defendants breached their duties of good faith and fair dealing and prevented Seneca from receiving the fruits that Seneca reasonably expected under the parties' contracts, including by communicating with Gilbarco in furtherance of acts and events that had the effect of Gilbarco terminating or reducing its relationship with Seneca. Defendants have thus acted contrary to the purpose for which the parties' contracts were made.

66.     Defendants' actions are offensive to the community standards of decency, fairness, and reasonableness.

67.     As a direct and proximate result of Defendants' breaches of their duties of good faith and fair dealing, Seneca has incurred and will continue to incur monetary damages in an amount to be determined at trial.

## COUNT IV:  TORTIOUS INTERFERENCE WITH EXISTING CONTRACT AND/OR BUSINESS RELATIONS WITH CUSTOMERS AGAINST ALL DEFENDANTS

68.     Seneca realleges and incorporates all prior paragraphs by reference.

69.     Seneca has existing contracts and/or business relationships with its customers, and by way of the materials Defendants accessed under the Confidentiality Agreements, Defendants were aware of these contracts and/or business relationships, including detailed financial and performance information concerning the customers.

70.     Defendants intentionally and improperly interfered with Seneca's contracts and/or business relationships with customers by exploiting sensitive information Defendants received under the Confidentiality Agreements to solicit Seneca's customers' business, thus interfering with the performance of these contracts and/or business relationships and making performance more burdensome or expensive.

71.     As a direct and proximate result of Defendants' tortious interference, Seneca has incurred and will continue to incur monetary damages in an amount to be determined at trial.

### COUNT V:  TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACT AND/OR BUSINESS RELATIONS WITH CUSTOMERS AGAINST ALL DEFENDANTS

72.     Seneca realleges and incorporates all prior paragraphs by reference.

73.     Seneca had prospective contractual and/or business relationships with customers that were identified in the materials Defendants received under the Confidentiality Agreements, which Defendants knew about because of their access to such materials.

74.     Defendants intentionally and improperly interfered with Seneca's prospective contracts and/or business relationships with these customers by exploiting sensitive information Defendants received under the Confidentiality Agreements, which caused contracts and/or business relationships to fail to materialize.

75.     As a direct and proximate result of Defendants' tortious interference, Seneca has incurred and will continue to incur monetary damages in an amount to be determined at trial.

### COUNT VI:  TORTIOUS INTERFERENCE WITH EXISTING CONTRACT WITH EMPLOYEES AGAINST D&H

76.     Seneca realleges and incorporates all prior paragraphs by reference.

77.     Seneca has existing Non-Compete Agreements with employees, and D&H was aware of these contracts by no later than February 7, 2024, when Seneca sent correspondence to D&H notifying D&H about the Non-Compete Agreements' existence and terms.

78.     D&H intentionally and improperly interfered with the Non-Compete Agreements by soliciting Seneca employees subject to the Non-Compete Agreements, thus interfering with the performance of these contracts and making performance more burdensome or expensive.

79.     As a direct and proximate result of D&H's tortious interference, Seneca has incurred and will continue to incur monetary damages in an amount to be determined at trial.

## CONDITIONS PRECEDENT

80.     All conditions precedent to Seneca's claims for relief have occurred, have been performed, and/or have been waived.

## REQUEST FOR INJUNCTIVE RELIEF

81.     Seneca is entitled to a preliminary injunction to stop D&H and JF from continuing to take actions in violation of the non-solicitation and non-inducement provisions, which are causing irreparable harm, including the loss of goodwill and business relationships with Seneca's customers, employees, and suppliers.

82.     The primary function of a preliminary injunction is to preserve the status quo until the final disposition of the case. To assess whether preliminary injunctive relief is appropriate, the Court considers the following factors: (1) Seneca's probability of success on the merits; (2) the threat of irreparable harm to Seneca; (3) the balance between the harm to Seneca and the potential harm to Defendants if the relief is granted; and (4) whether an injunction serves the public interest. Because each of these factors weighs in Seneca's favor, the Court should enter a preliminary

injunction preventing Defendants from further solicitation of Seneca's customers and employees

and any further inducement of Gilbarco to terminate or reduce its relationship with Seneca.

## **PRAYER FOR RELIEF**

Seneca respectfully requests that the Court render judgment against Defendants on all

claims asserted herein and declare as follows:

a. D&H is enjoined from any further solicitation of Seneca's customers or employees through and including April 4, 2025;

b. JF is enjoined from any further solicitation of Seneca's customers through and including August 9, 2025;

c. Defendants are enjoined from any further inducement of Gilbarco to terminate or reduce Gilbarco's relationships with Seneca;

d. Defendants are liable for breaching their respective contractual obligations to Seneca;

e. Defendants are liable for breaching their respective implied obligations of good faith and fair dealing to Seneca;

f. Defendants are liable for tortiously interfering with Seneca's existing and prospective contracts and/or business relations;

g. Seneca is entitled to recover actual, compensatory, and/or consequential damages in an amount to be determined at trial;

h. Seneca is entitled to an accounting of all profits, benefits, and/or other compensation provided to or derived by Defendants through their wrongful conduct;

i. Seneca is entitled to disgorgement of all benefits provided to or derived by Defendants due to their wrongful conduct;

j. Seneca is entitled to recover its reasonable attorneys' fees, costs, and related expenses incurred in bringing and prosecuting this action;

k. Seneca is entitled to pre-judgment and post-judgment interest at the highest lawful rates; and

l. Seneca is entitled to all such other and further relief to which it may be entitled in law or equity.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

*/s/ Guy R. Cook*
Guy R. Cook
   Iowa State Bar No. AT0001623
   gcook@grefesidney.com
Benjamin T. Erickson
   Iowa State Bar. No. AT0012927
   berickson@grefesidney.com
GREFE & SIDNEY, P.L.C.
500 East Court Avenue, Suite 200
Des Moines, Iowa 50309
Telephone: 515-245-4300
Facsimile: 515-245-4452

Robert V.P. Waterman, Jr.
   Iowa State Bar No. AT0008339
   bwaterman@l-wlaw.com
LANE & WATERMAN LLP
220 North Main Street, Suite 600
Davenport, Iowa 52801
Telephone: 563-333-6618
Facsimile: 563-324-1616

David H. Harper
   Texas State Bar No. 09025540 (*Admitted Pro Hac*)
   david.harper@haynesboone.com
Jason N. Jordan
   Texas State Bar No. 24078760 (*Admitted Pro Hac*)
   jason.jordan@haynesboone.com
Alexandra Larkin
   Minnesota State Bar No. 0403959 (*Admitted Pro Hac*)
   alexandra.larkin@haynesboone.com
Ethan Kerstein
   Texas State Bar No. 24116611 (*Admitted Pro Hac*)
   ethan.kerstein@haynesboone.com
HAYNES AND BOONE, LLP
2801 N. Harwood Street, Suite 2300
Dallas, Texas 75201

Telephone: 214-651-5000
Facsimile: 214-651-5940

**ATTORNEYS FOR PLAINTIFF SENECA COMPANIES, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2024, a true and correct copy of the foregoing document was filed electronically with the Clerk of the Court through the CM/ECF system, which will send a notice of electronic filing to all counsel of record who are deemed to have consented to electronic service.

*/s/ Rose Field*
Rose Field